IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Civil Action No: |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| SUMMIT TRUST COMPANY, RAMPART CAPITAL MANAGEMENT, LLC, TRUST COUNSELORS NETWORK, INC., BROWN INVESTMENT ADVISORS, INC., KEVIN C. BROWN, and GEORGE  P. BROWN, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| RAMPART FUND LP, WEALTH MAINTENANCE ORGANIZATION, LLC, and HODDINOTT FARM DEVELOPMENT, LLC, | ) ) ) ) ) | |
| Relief Defendants. | ) | |

---

## COMPLAINT

---

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges

as follows against Defendants Summit Trust Company ("STC"), Rampart Capital

Management, LLC ("RCM"), Trust Counselors Network, Inc. ("TCN"), Brown

Investment Advisors, Inc. ("BIA"), Kevin C. Brown ("Kevin Brown"), and George P.

Brown ("George Brown") (collectively, "Defendants") and Relief Defendants Rampart

Fund LP ("Rampart Fund"), Wealth Maintenance Organization, LLC ("WMO"), and

Hoddinott Farm Development, LLC ("Hoddinott") (collectively, "Relief Defendants"):

## I.      SUMMARY OF THE ACTION

1.      This action primarily involves three separate multi-million dollar offering

frauds conducted by Defendants Kevin Brown and George Brown (collectively "the

Browns") through various entities that they owned, managed, and/or controlled, including

Defendants STC, RCM, TCN, and BIA and Relief Defendants Rampart Fund, WMO, and

Hoddinott.  As alleged below, the fraudulent, unregistered offerings involved the offer

and sale of: (a) STC's preferred stock ("STC Preferred Stock"); (b) promissory notes

issued by the Rampart Fund (the "Rampart Notes"); and (c) certain investment products

offered by TCN (the "Security Products").

2.      This action also involves the receipt of undisclosed transaction-based fees

by STC and Kevin Brown in violation of the broker-dealer registration provisions of the

federal securities laws.

**The STC Preferred Stock Offering Fraud**

3.      From approximately February 2008 through February 2014, STC raised

approximately $33.2 million through an unregistered offering of its Preferred Stock that it

represented would be used for business expansion and acquisitions.  Instead, STC and the

Browns used much of the proceeds: (a) as a Ponzi scheme to pay dividends and make

redemptions to other STC Preferred Stock shareholders; (b) to cover interest payments

and redemptions for the Rampart Notes; (c) to cover annuity and other obligations of

TCN; (d) to pay various operational expenses of the Brown's other affiliated entities, BIA

and WMO; and (e) for certain undisclosed, speculative investments.

**The Rampart Note Offering**

4.      Between August 2008 and September 2013, the Rampart Fund raised

approximately $7.9 million through the unregistered public offering of its Notes with

various fixed interest rates and maturity dates, and disclosed that the proceeds of the

offering would be used to invest in debt securities used to fund a third party's mezzanine

debt financing program.  During the offering period, RCM, BIA, and the Browns acted as

the investment advisers to the Rampart Fund.

5.      The third party began defaulting on its obligations to the Rampart Fund in

November 2009.  The Fund then sued the third party in July 2010, and received a court

judgment on all claims and relief in March 2011, but was never able to collect on that

judgment.  However, RCM, BIA, STC, and the Browns never disclosed the third party's

defaults or the resulting lawsuit to current and prospective investors.  Rather, they

continued raising monies through the Rampart Note offering, and used the proceeds: (a)

as a Ponzi scheme to pay interest and make redemptions to existing noteholders

("Rampart Noteholders"); (b) to make undisclosed investments in the securities of the

Browns' affiliated entities, STC and WMO; and (c) to make speculative investments

unrelated to mezzanine debt financing programs.  In fact, even before the third party

began defaulting, the Rampart Fund invested over $1.5 million in a variety of

investments that were unrelated to mezzanine debt financing programs.

**The TCN Offering Fraud**

6.      TCN is a non-profit organization that the Browns have purportedly operated as a public charity since 2004.  As part of its operations, TCN has offered investors the ability to invest in various Security Products, including charitable gift annuities and charitable installment bargain sales.  With each of those products, investors transferred certain assets to TCN in exchange for periodic annuity payments, which TCN marketed as "guaranteed."

7.      Since at least 2004, TCN sold 75 Security Products in exchange for assets valued at approximately $12.9 million.  However, rather than investing those assets in more traditional investments that would have enabled TCN to meet its annual annuity obligations, Kevin Brown, acting on behalf of TCN and with George Brown's knowledge, invested a significant portion of those assets in speculative and risky investments that are now worthless.  Accordingly, since at least 2008, Kevin Brown operated TCN as a Ponzi scheme – using funds raised from the sale of new Security Products to make the ongoing annuity payments to existing investors.  The Browns also misappropriated investor funds by transferring over $300,000 to BIA, taking out personal loans for an outstanding amount of $360,000, and making undisclosed payments to certain third parties who solicited investments in the Security Products.

**The Receipt of Transaction-Based Fees by STC and Kevin Brown**

8.      Between 2008 and 2014, neither STC nor Kevin Brown was registered with the Commission as a broker or dealer or associated with a broker or dealer registered with the Commission.  However, during that period, both Defendants collected hundreds

of thousands of dollars in undisclosed transaction-based fees for their roles in effecting

transactions in securities for the accounts of others.

## II.     SUMMARY OF THE VIOLATIONS

9.     As a result of the conduct described herein, Defendants STC, RCM, TCN,

BIA, Kevin Brown, and George Brown offered and sold unregistered securities, obtained

money or property on the basis of misleading statements and omissions, made misleading

statements and omissions, engaged in a scheme to defraud, and therefore have violated,

and unless restrained and enjoined, will continue to violate, Sections 5(a), 5(c), 17(a)(1),

(2), and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c),

and 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5].

10.     As a result of the conduct described herein, Defendants RCM, BIA,

Kevin Brown, and George Brown engaged in prohibited transactions by an investment

adviser, and therefore have violated, and unless restrained and enjoined, will continue to

violate, Sections 206(1), (2), (3), and (4) of the Investment Advisers Act of 1940

("Advisers Act") [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. §

275.206(4)-8].

11.     As a result of the conduct described herein, Defendants RCM, BIA, STC,

Kevin Brown, and George Brown aided and abetted, and unless restrained and enjoined,

will continue to aid and abet, the Rampart Fund's violations of Section 7(a) of the

Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(a)].

12.     As a result of the conduct described herein, Defendants STC and Kevin Brown effected transactions and/or induced or attempted to induce the purchase or sale of securities without registering as a broker or dealer with the Commission or without associating with a broker or dealer registered with the Commission, and therefore have violated, and unless restrained and enjoined, will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)].

### III.     JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9], and Section 42(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)] to restrain and enjoin the Defendants from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The Commission seeks permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus pre-judgment and post-judgment interest thereon, and third-tier civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9], and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].  The SEC also seeks the appointment of a receiver.  Finally, the SEC seeks to recover from the Relief Defendants all money, property, and assets transferred to them

that were derived from the violations of the securities laws by the Defendants as alleged herein.

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act  [15 U.S.C. §80b-14], and Section 44 of the Investment Company Act [15 U.S.C. § 80a-43].  In connection with the transactions, acts, practices, schemes, devices, artifices to defraud, and courses of business described in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the means and instruments of transportation or communication in interstate commerce, or instrumentality of interstate commerce.

15.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77u(a), 78aa, 80a-43, and 80b-14 and 28 U.S.C. § 1391(b)(2).  Defendant RCM maintains its principal place of business in Colmar, Pennsylvania; Defendant TCN is a Pennsylvania non-profit organization and maintains its principal place of business in Colmar, Pennsylvania; Defendant BIA is an investment adviser registered in the State of Pennsylvania and maintains its principal place of business in Montgomeryville, Pennsylvania; Defendant STC maintains a marketing office in Colmar, Pennsylvania; Defendant Kevin Brown resides in Hilltown, Pennsylvania; and Defendant George Brown resides in Chalfont, Pennsylvania.  In addition, many of the acts and practices described in this Complaint occurred in the Eastern District of Pennsylvania.

## IV.   DEFENDANTS

16.    **Summit Trust Company** is a Nevada-chartered trust company with its principal place of business in Las Vegas, Nevada, and a marketing office in Colmar, Pennsylvania.  STC purports to be in the business of providing trust administration, estate planning, charitable giving, gift administration, and custodial services.  After the Browns purchased STC in 2004, Kevin Brown became the sole common stock shareholder of STC, and both Browns occupied various officer and director positions with STC.  STC has not registered any class of securities or securities offerings with the SEC.

17.    **Rampart Capital Management, LLC,** a Delaware limited liability company with its principal place of business in Colmar, Pennsylvania, was formed in 1999 by its only two members, the Browns.  RCM is an investment adviser and the general partner to the Rampart Fund.  RCM has never been registered with the Commission in any capacity.

18.    **Trust Counselors Network, Inc.**, a Section 501(c)(3) non-profit organization formed by the Browns that maintains its principal place of business in Colmar, Pennsylvania.  From at least 2004, TCN offered various Security products such as charitable gift annuities and charitable installment bargain sales.  TCN has not registered any class of securities or securities offerings with the SEC.

19.    **Brown Investment Advisors, Inc.**, a Pennsylvania corporation with its principal place of business in Montgomeryville, Pennsylvania, is an investment adviser that has been owned by the Browns since they formed the entity in 1987.  BIA is registered as an investment adviser with the states of Pennsylvania and New Jersey, and it

served as an investment adviser to the Rampart Fund.  BIA was previously registered with the Commission as an investment adviser from approximately December 1999 until January 2006.

20.     **Kevin C. Brown**, age 49 and a resident of Hilltown, Pennsylvania, has been affiliated in various capacities with Defendants STC, RCM, TCN, and BIA during their existence.  Specifically, at times relevant to this Complaint, he served as: (1) the president, director and the sole common stock shareholder of STC; (2) the president, owner, and managing member of RCM; (3) the president of TCN; and (4) the president, part owner, and an investment adviser representative ("IAR") of BIA.  Kevin Brown also has at least partial ownership and/or control of each Relief Defendant (described below) through his roles as: (1) a managing member of RCM, the general partner and adviser to the Rampart Fund; (2) the president, managing member, and shareholder of WMO; and (3) the managing member of Hoddinott.

21.     **George P. Brown**, age 81, father of Kevin Brown, and a resident of Chalfont, Pennsylvania, has been affiliated in various capacities with Defendants STC, RCM, TCN, and BIA during their existence.  Specifically, at times relevant to this Complaint, he served as: (1) the chief marketing officer and director of STC; (2) the vice president, owner, and managing member of RCM; (3) the vice president and chairman of TCN; and (4) the chairman, part owner, and an IAR of BIA.  George Brown also has served as: (1) a managing member of RCM, the general partner and adviser to Relief Defendant Rampart Fund; and (2) the chairman, managing member, and shareholder of Relief Defendant WMO.

## V.     RELIEF DEFENDANTS

22.     **Rampart Fund LP** is a Delaware limited partnership formed by the Browns to function as a hedge fund.  From at least August 2008 through September 2013, the Rampart Fund engaged in a public offering of the Rampart Notes so that the Fund could, in turn, invest in debt securities offered and sold by a third party that purported to finance mezzanine loans to government contractors.  During that time, the Rampart Fund was an "investment company" as defined by Section 3(a)(1)(A) of the Investment Company Act because it was an issuer which held itself out as being engaged primarily, or proposed to engage primarily, in the business of investing, reinvesting, or trading in securities.  The Rampart Fund sold the Notes to more than 100 investors who were not qualified purchasers.  The Rampart Fund and the Rampart Notes have never been registered with the Commission in any capacity.  The Rampart Fund obtained money, property, and assets which were derived from the violations of the securities laws by the Defendants as alleged herein.

23.     **Wealth Maintenance Organization, LLC**, a Pennsylvania limited liability company with its principal place of business in Colmar, Pennsylvania, was formed in 2007 by the Browns to purportedly develop software that financial advisers could use to evaluate whether investments comported with clients' social values.  WMO obtained money, property, and assets which were derived from the violations of the securities laws by the Defendants as alleged herein.

24.     **Hoddinott Farm Development, LLC**, a Pennsylvania limited liability company with its principal place of business in Colmar, Pennsylvania, was formed by

Kevin Brown in 2011 to purportedly invest in a real estate development project in Howard County, Maryland.  Hoddinott obtained money, property, and assets which were derived from the violations of the securities laws by the Defendants as alleged herein.

## VI.    FACTS

### A.    The STC Preferred Stock Offering

**Background of STC's Ownership Structure and Operations**

25.    STC, a Nevada-chartered trust company purchased by the Browns in 2004, purportedly provides a full range of trust services for institutions, corporations, charities, and individuals.

26.    Since 2004 through at least part of 2014, Kevin Brown served as STC's president and CEO, and was the sole owner of STC's common stock, while George Brown served as STC's chief marketing officer.

27.    STC has always maintained its principal place of business in Las Vegas, and therefore, as a Nevada trust company, it is regulated by the Financial Institutions Division of the State of Nevada ("Nevada FID").  In approximately 2006, STC opened an unregistered marketing office in Colmar, Pennsylvania.

28.    To promote its trust services and generate new business, STC historically relied upon, and entered into written solicitor agreements with, a group of individuals that STC generally referred to as "Independent Trust Consultants" ("Independent Consultants").  When Independent Consultants referred clients to STC, they received a portion of the annual fee that STC charged client accounts, which was typically a percentage of the client's assets held at STC.

29.     Since the Browns began operating STC in 2005, the company has never been profitable.  Specifically, from 2005 through 2007 – the years before STC began offering its preferred stock as alleged below – STC purportedly realized net losses of approximately $72,212, $244,738, and $52,578, respectively.  Thereafter, from 2008 through 2014 – the period over which STC offered and sold its preferred stock – STC realized even larger net losses of approximately $290,325, $216,455, $541,621, $805,861, $731,262, $3,210,170, and $1,023,792, respectively.

**Overview of the STC Preferred Stock Offering**

30.     From February 2008 through February 2014 (the "Preferred Stock Offering Period"), STC raised approximately $33.2 million from over 150 investors/accounts through an offering of its non-voting preferred stock (the "STC Preferred Stock" or "Preferred Stock").  During that same period, STC redeemed approximately $4.6 million in Preferred Stock, leaving approximately $28.6 million of the Stock outstanding.

31.     Throughout the offering, STC Preferred Stock was priced at $50 per share, with an annual cash dividend of 6%, paid quarterly.  STC remained current on its dividend obligations by paying approximately $3.8 million to the Preferred Stock shareholders until STC halted its preferred dividend payments in April 2014 pursuant to a Consent Order issued by the Nevada FID.

32.     Throughout the Preferred Stock Offering Period, STC purportedly used three different versions of a limited offering memorandum ("LOM"): (1) an LOM dated

February 28, 2008 (the "2008 LOM"); (2) an LOM dated February 24, 2009 (the "2009 LOM"); and (3) an LOM dated April 10, 2013 (the "2013 LOM").

33.     STC has been unable to locate a copy of the 2008 LOM.  Based on information and belief, the 2008 LOM was prepared by STC's outside counsel, and reviewed by the Browns prior to dissemination to investors.

34.     Based on information and belief, the 2009 LOM was created by George Brown and was substantially identical to the 2008 LOM.  Therefore, based on information and belief, all allegations herein as to the 2009 LOM are re-alleged with respect to the 2008 LOM.

35.     Based on information and belief, the 2013 LOM was created by George Brown by making relatively minor modifications to the 2009 LOM.

36.     Based on information and belief, Kevin Brown reviewed the 2009 and 2013 LOMs.  As the sole owner of STC's common stock at the time the three LOMs were created, Kevin Brown was ultimately responsible for their content.

37.     Throughout the Preferred Stock Offering Period, the Browns disseminated the LOMs when they solicited STC Preferred Stock investors.  The Browns and STC also disseminated the LOMs to Independent Consultants who solicited STC Preferred Stock investors.

**The STC Preferred Stock Offering Was Fraudulent**

38.     According to the terms of the 2009 LOM, STC sought to raise a maximum of $10 million from accredited investors through the sale of $5 million of STC's common stock and $5 million of its Preferred Stock.  STC represented that its primary intended

uses of the net offering proceeds would be to open up offices in additional states, and

later to acquire additional assets under management from other trust or advisory firms.

39.     The Summary of the Offering section of the 2009 LOM stated in relevant

part:

**Use of Proceeds**

Proceeds from the sale of shares will be used for the purpose of opening
branch offices in several key states.  These states require net capital of as
much as $2 million.  We plan to raise $2 million to establish a reserve for
registering in Pennsylvania, $3 million for reserves for other states and $1
million for working capital, and another $4 million for potential
acquisitions, further reserves and working capital, software development
and marketing programs in partnership with community banks.  There are
three stages of development for which the new capital is being raised:

   o  Stage One – Pennsylvania Operations.  The first $2 million raised
      will be maintained in a "Capital Reserve Fund" to qualify for the
      reserve required to file for a branch office in Pennsylvania.
   o  Stage Two – Expanded State Operation.  The next $4 million
      raised will assist in the expansion to several other key states where
      we have strong business opportunities.
   o  Stage Three – Acquisition of Operations.  The final $4 million will
      be employed to take advantage of potential acquisition and
      expansion opportunities.

40.     The 2013 LOM eliminated the more detailed uses of proceeds contained in

the 2009 LOM, and instead represented that STC would maintain the first $20 million "in

a 'Capital Reserve Fund' to qualify for the reserve required by the regulatory authorities."

The 2013 LOM also stated that STC would use the next $20 million to expand its

"business through investments in 'strategic partnerships' with other financial services

firms."

41.     By 2013, STC had sold over $26 million of its Preferred Stock – more

than five times the purported $5 million maximum set forth in the 2009 LOM.

Accordingly, the 2013 LOM increased the maximum amount offered on the Preferred Stock to a total of $50 million, while disclosing that STC had already raised $25 million from sales of its Preferred Stock.

42.     Contrary to the representations in the 2009 and 2013 LOMs concerning the use of offering proceeds, STC did not use any Preferred Stock Offering proceeds to open up offices in additional states, to acquire additional assets from other firms, or to establish reserves suitable for those purposes.  Instead, throughout the entire offering period, STC and the Browns used most investor proceeds for three undisclosed purposes.

a.   First, similar to a Ponzi scheme, the Browns used more than $8.3 million to make dividend payments and redemptions to other STC Preferred Stock shareholders;

b.   Second, the Browns misappropriated more than $7.1 million to cover interest payments and redemptions for notes issued by the Rampart Fund, to cover annuity and other obligations of TCN, and to cover the operational expenses of their other affiliated entities, BIA and WMO; and

c.   Third, the Browns caused STC to make speculative investments of more than $7.4 million that they hoped might generate sufficient returns with which STC could continue to pay 6% annual dividends to Preferred Stock shareholders, as well as cover the 6-10% commissions that STC paid to the Independent Consultants for their Preferred Stock sales.

43.     The following chart summarizes STC's unauthorized uses of proceeds from the Preferred Stock offering:

| Payments to Existing Preferred Stock Shareholders | Amount |
|---|---|
| Dividends | $3,754,729 |
| Redemptions | $4,565,373 |
| **Payments to the Browns' Other Affiliated Entities** | |
| Rampart Note Redemptions/Interest Payments | $3,814,734 |
| Cash Advances to TCN | $1,873,297 |
| Cash Advances to BIA | $1,136,901 |
| Cash Advances to WMO | $345,694 |
| **Speculative Investments** | |
| Investments in private companies via notes, stock, membership interests, and limited partnership interests | $6,486,177 |
| Precious Metals | $1,025,546 |

44.     STC's speculative investments alleged above included its expenditures of $631,000 and $30,000 to purchase membership interests in Relief Defendants Hoddinott and WMO, respectively.

45.     Kevin Brown orchestrated the STC Preferred Stock offering fraud as the person primarily responsible for determining how STC used investor proceeds. Specifically, when investor proceeds were raised, he pooled them into one of two bank accounts maintained by STC, and then allocated the proceeds to cover STC Preferred Stock dividends and redemption requests, to help the Browns' affiliated entities, and to make investments with various third parties.  Furthermore, Kevin Brown knew that STC

did not use investor proceeds to open up offices in additional states or to make acquisitions as disclosed in the LOMs, and therefore that STC's undisclosed uses of proceeds were inappropriate.  During the STC Preferred Stock Offering Period, he also knew that STC did not generate enough cash flow from its operations and investments to pay the Preferred Stock dividends, partly because: (1) most of STC's speculative investments sustained substantial losses; and (2) the Browns diverted investor proceeds to pay other STC Preferred Stock shareholders and to help the Browns' other affiliated entities, the Rampart Fund, WMO and BIA.

46.     George Brown also played an instrumental role in the fraud.  Specifically, he knew that STC was using investor funds for purposes that contradicted the use of proceeds disclosures in the LOMs.  For example, George Brown knew at the beginning of the offering period that STC did not intend to register itself as a Pennsylvania trust company, and therefore did not require a $2 million capital reserve fund as claimed in the 2008 and 2009 LOMs.   He also knew that STC had diverted money to the Browns' affiliated entity, WMO, because George Brown had requested the loan.  George Brown also knew about several of STC's speculative investments with third parties that were inconsistent with STC's use of proceeds disclosures.

47.     The misrepresentations and omissions by STC and the Browns concerning the STC Preferred Stock use of proceeds were material to investors because the investors believed that their funds would be used in a manner consistent with the disclosures in the LOMs, and not to make Ponzi payments to other investors, to make payments to the Browns' other affiliated entities, or to make speculative investments as alleged above.

17

48.     The misappropriation of investor proceeds for uses other than what was disclosed and authorized was also material.

49.     STC and the Browns knew or were reckless in not knowing that their misrepresentations and omissions and misappropriation of investor proceeds described herein were materially false and misleading.

**STC Falsely Stated that None of Its Officers and Employees Would Receive Remuneration in Connection with the Preferred Stock Offering**

50.     The LOMs represented that STC's officers and employees "will receive no commissions or other remuneration in connection with the sale of shares."  The LOMs further explained that STC would:

> reserve the right to engage one or more finders or agents and to pay a fee equal to up to 10% of the related offering proceeds.  We will notify you if there is a finder's or agent's fee associated with your investment and provide information with respect to the agent or finder and the amount of such fee.

51.     Contrary to these representations, however, Kevin Brown paid himself $76,950 in undisclosed fees in connection with what he called the "override" spread on some Independent Consultants' sales of the STC Preferred Stock.  Specifically, in some instances, STC arranged to pay an Independent Consultant something less than the 10% fee maximum specified in the LOM, and when that occurred, Kevin Brown retained the differential.

52.     The misrepresentations and omissions by STC and Kevin Brown concerning the fees that STC paid him in connection with the sales of the STC Preferred Stock were material to investors because the investors believed that their funds would be

used in a manner consistent with the disclosures in the LOMs, and not to pay Kevin

Brown – an officer and employee of STC – fees from investor proceeds.

53.     The misappropriation of investor proceeds for uses other than what was

disclosed and authorized was also material.

54.     STC and Kevin Brown knew or were reckless in not knowing that their

misrepresentations and omissions and the misappropriation of investor proceeds

described herein were materially false and misleading.

**STC's Preferred Stock Was Not Registered with the SEC or Exempt from Registration**

55.     The definition of a "security" under Section 2(a)(1) of the Securities Act

[15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §

77c(a)(10)]  includes "stock."  The STC Preferred Stock is a "security" as defined by

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

56.     During the STC Preferred Stock Offering Period, STC raised

approximately $32.7 million through its Preferred Stock offering from more than 150

investors and/or STC accounts in multiple states.

57.     STC, the Browns, and the Independent Consultants offered and sold the

STC Preferred Stock to investors using the means or instruments of interstate commerce

including but not limited to telephones, the Internet, and the mails.

58.     The STC Preferred Stock was offered and sold to unaccredited and

unsophisticated investors, and STC, the Browns, and the Independent Consultants did

note have a reasonable basis to believe that all investors were accredited and

sophisticated.

59.     STC, the Browns, and the Independent Consultants failed to provide investors with the information required under Rule 502(b) of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

60.     STC did not have a pre-existing substantive relationship with each investor, and, therefore, engaged in a general solicitation.

61.     STC's Preferred Stock offering has never been registered with the SEC or any state securities authority.

**B.      The Rampart Fund Note Offering**

**Background: Prior Investments in Purported Mezzanine Loans by the Browns' Affiliated Entities**

62.     In approximately 2004, George Brown met the principal of The Underwriters Group ("TUG"), a Florida entity that purported to make short-term mezzanine loans to government construction and maintenance contractors.  Shortly thereafter, the Browns began investing funds from TCN in TUG's financing program. Specifically, from approximately December 2004 through May 2007, TCN made 27 loans to TUG, totaling $1.8 million.  Each loan was for a one-year term, with an annual interest rate of 18%, paid quarterly.  Because TUG always met its quarterly interest obligations on all loans through at least October 2009, TCN continuously extended the loans for additional one-year terms, rather than obtaining redemptions of their principal.

63.     In the middle of 2008, STC also invested some of its funds with TUG. Specifically, between June and August 2008, STC made four loans to TUG for a total of approximately $1 million.  These loans were also for one-year terms, with an 18% annual interest rate, paid quarterly.  Because TUG initially met its quarterly interest obligations,

STC likewise agreed to one-year extensions on each of its four promissory notes when they came due from June through August 2009.

### Overview of the Rampart Fund Note Offering

64.     In late 2008, the Browns decided to make additional investments in TUG through the Rampart Fund.  Specifically, in August 2008, the Rampart Fund began raising funds by issuing promissory notes (the "Rampart Notes"), which bore maturity dates of between 1-5 years and annual interest rates of between 6-10%, paid quarterly.

65.     Upon receipt of funds from the Rampart Noteholders, the Rampart Fund pooled the money in its bank account and then made loans to TUG in exchange for one-year promissory notes issued by TUG that bore an 18% annual interest rate, paid quarterly (the "TUG Notes").

66.     Between approximately August 2008 and September 2013, the Rampart Fund raised approximately $7.9 million in the Rampart Note offering from over 100 investors.  During that period, the Rampart Fund redeemed approximately $3.6 million of Notes, leaving about $4.3 million in outstanding principal.  The Rampart Fund remained current on its interest obligations by paying approximately $2.8 million to the Rampart Noteholders until the Rampart Fund voluntarily halted the Rampart Note offering and quarterly payments in approximately August 2014.

67.     At all times between August 2008 and August 2014, RCM, BIA, and the Browns acted as investment advisers to the Rampart Fund, and received compensation, directly or indirectly, for their services.

68.     Furthermore, at all times between August 2008 and August 2014, the Rampart Fund was a pooled investment vehicle as defined by Rule 206(4)-8 under the Advisers Act.

69.     RCM, BIA, STC, and the Browns solicited investors and advisory clients for investment in the Rampart Notes.  The Rampart Fund also relied upon the Independent Consultants to solicit investors in its Notes.  RCM, BIA, STC, and the Browns provided copies of the Rampart Note offering documents (as alleged and described below) to the investors and advisory clients they solicited as well as to the Independent Consultants.

**The Rampart Note Offering Documents**

70.     During the offering period, the Rampart Fund used at least two different offering documents for the offer and sale of its Notes: (1) a private placement memorandum dated August 16, 2009; and (2) an undated five-page term sheet (collectively the "Rampart Offering Materials").

71.     George Brown drafted the Rampart Offering Materials, which Kevin Brown reviewed.  As the only members of RCM, the general partner to the Rampart Fund, both Browns were responsible for the content of the Rampart Offering Materials.

72.     The Rampart Offering Materials disclosed that the Fund sought to raise a maximum of $25 million through the sale of Notes, which it planned to invest with TUG's mezzanine loan program or other similar programs paying an 18% annual return. The Rampart Offering Materials acknowledged that the Fund's success would be "totally dependent on its ability to fund mezzanine loans consistent with its investment goals."

73.     The Rampart Offering Materials also disclosed that RCM would be the adviser to the Rampart Fund and would be entitled to compensation for its advisory services.

**The Rampart Note Offering Was Fraudulent**

74.     Beginning in November 2009, TUG began defaulting on quarterly interest payments and redemptions for every TUG Note that came due, including the TUG Notes issued to TCN and STC.  Soon thereafter, the Browns learned that TUG's principal had likely misappropriated at least some of the funds received from the Rampart Fund.

75.     Accordingly, on or about July 27, 2010, the Rampart Fund, TCN, and STC filed suit against TUG and its principal alleging fraud and other claims, and sought recovery of all amounts loaned plus accrued interest.  On or about March 28, 2011, the court entered judgment in favor of the plaintiffs on their claims for a total amount of approximately $7 million.  The Rampart Fund, TCN, and STC were never able to collect any amount on the judgment.

76.     After TUG began defaulting on its TUG Notes in November 2009, RCM, BIA, STC, and the Browns never disclosed to existing or prospective Rampart Noteholders or the Independent Consultants selling the Rampart Notes that: (i) TUG had defaulted on all of its TUG Notes, including the associated interest payments; (ii) the Rampart Fund (and other entities controlled by the Browns) had sued TUG and its principal for fraud and other claims; (iii) the Rampart Fund (and other entities controlled by the Browns) had obtained a judgment against TUG and its principal for approximately $7 million; or (iv) the Rampart Fund's inability to collect on the judgment.

77.     Instead, from approximately December 2009 through September 2013, the Rampart Fund, RCM, BIA, STC, and the Browns raised approximately $2.9 million in additional investor proceeds through the Rampart Note offering even though they had no intention of investing proceeds with TUG.

78.     The Rampart Fund, RCM, BIA, STC, and the Browns used the newly-raised proceeds in one of three undisclosed ways: (1) as part of a Ponzi scheme so that the Rampart Fund could make interest payments and redemptions to existing Rampart Noteholders; (2) to make a variety of speculative investments that were unrelated to mezzanine loans; and (3) to make investments in the securities of the Browns' affiliated entities, STC and WMO.

79.     Specifically, from 2010 through 2014, the Rampart Fund made approximately $2 million in interest payments and redeemed approximately $3.6 million of the Rampart Notes.  During this period, the Rampart Fund only had two sources of funds – $3.8 million in cash advances from the STC Preferred Offering and other investor proceeds in the Rampart Note offering.

80.     Furthermore, over the entire offering period – even before TUG began defaulting on its interest payment obligations in November 2009 – the Rampart Fund invested over $1.5 million in at least 14 different investments that were unrelated to mezzanine loans, none of which RCM, BIA, STC, or the Browns disclosed to investors or the Independent Consultants.

81.     As part of the investments alleged above, RCM, BIA and the Browns caused the Rampart Fund to purchase $100,000 of STC's Preferred Stock and a $100,000

membership interest in WMO, both of which were purchases of securities.  WMO and STC were entities that were under common control with other investment advisers to the Rampart Fund – RCM, BIA, and the Browns.  Therefore, RCM, BIA, and the Browns had a personal interest in these principal transactions.  However, these Defendants did not provide the Rampart Fund with written disclosure before completion of the transactions.  Nor did they obtain consent from the Rampart Fund.  The Fund was not registered and it did not have a board from which the Defendants could obtain consent.

82.     Kevin Brown orchestrated the Rampart Note offering fraud as he was primarily responsible for the Rampart Fund's use of investor funds to pay interest and redemptions to other investors, the speculative investments that were unrelated to mezzanine loans, and the principal transactions.  He also knew that the Rampart Fund, RCM, BIA, STC, and the Browns should have disclosed TUG's defaults, as well as the Rampart Fund's ensuing litigation and judgment against TUG, to investors and the Independent Consultants.

83.     George Brown also played an instrumental role in the fraud.  Specifically, because George Brown signed each Rampart Note on behalf of the Rampart Fund throughout the offering period, he knew or was reckless in not knowing that the Rampart Fund continued to raise millions of dollars for years after TUG began defaulting on its obligations in November 2009.  He also knew that RCM, BIA, STC, and the Browns had not disclosed TUG's default and the ensuing litigation to investors and the Independent Consultants.  In addition, he knew that monies from the Fund were used to make

investments unrelated to the TUG Notes or other mezzanine loans and for the principal transactions without providing disclosure or obtaining consent.

84.     The misrepresentations and omissions by RCM, BIA, STC, and the Browns concerning the Rampart Note offering use of proceeds were material to investors because the investors believed that their funds would be used in a manner consistent with the disclosures in the Rampart Note Offering Documents, and not to make Ponzi payments to other investors, to make payments to the Browns' other affiliated entities, or to make speculative investments.

85.     Furthermore, the misrepresentations and omissions by RCM, BIA, STC, and the Browns concerning the status of TUG's mezzanine loan program, including its defaults on the TUG Notes, the resulting lawsuit and judgment, and the inability to collect on that judgment, were material to investors because investors relied on the success of TUG's mezzanine loan program to pay their expected return on the Rampart Notes.

86.     The misappropriation of the Fund's assets for uses other than what was disclosed and authorized was also material.

87.     RCM, BIA, STC, and the Browns knew or were reckless in not knowing that their misrepresentations and omissions and the misappropriation of fund assets described herein were materially false and misleading.

**The Rampart Note Offering Was Not Registered with the SEC or Exempt from Registration**

88.     The definition of a "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §

77c(a)(10)]  includes "any note" or an "investment contract."  The Rampart Notes are

"securities" as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the

Exchange Act.

89.     From approximately August 2008 through September 2013, the Rampart

Fund raised approximately $7.9 million through its Rampart Note offering from more

than 100 investors and/or STC accounts in multiple states.

90.     The Rampart Fund, RCM, BIA, STC, the Browns, and the Independent

Consultants offered and sold the Rampart Notes to investors using the means or

instruments of interstate commerce including but not limited to telephones, the Internet,

and the mails.

91.     The Rampart Notes were offered and sold to unaccredited and

unsophisticated investors, and the Rampart Fund, RCM, BIA, STC, the Browns, and the

Independent Consultants did not have a reasonable basis to believe that all investors were

accredited and sophisticated.

92.     The Rampart Fund, RCM, BIA, STC, the Browns, and the Independent

Consultants failed to provide investors with the information required under Rule 502(b)

of Regulation D [17 C.F.R. § 230.502(b)], including an audited balance sheet.

93.     The Rampart Fund did not have a pre-existing substantive relationship

with each investor, and, therefore, engaged in a general solicitation.

94.     The Rampart Note offering has never been registered with the SEC or any

state securities authority.

C.      **The Trust Counselors Network**

**Background of the Security Products Offered by TCN**

95.      TCN is a Section 501(c)(3) non-profit organization, which the Browns have purportedly operated as a public charity since at least 2004.  Since that time, TCN solicited investors to transfer assets – including annuities, stocks, cash or other assets – to TCN in exchange for one of two investment products that TCN referred to as charitable gift annuities and charitable installment bargain sales (collectively referred to as "Security Products").

96.      TCN marketed its Security Products as a way for investors to: (i) make charitable gifts; (ii) reap various tax benefits from those gifts; (iii) have professionals manage the funds; and (iv) provide a guaranteed payment stream to annuitants or beneficiaries of their choice.

97.      TCN sold two types of Security Products.  For TCN charitable gift annuities ("CGAs"), individuals or entities (called the donor) made irrevocable gifts (in the form of cash, securities, or other property) to TCN in exchange for TCN's agreement to make fixed annuity payments over the life of one or two annuitants (usually spouses).  Once the gift was made, it became the property of TCN, which then had full discretionary authority over investment decisions related to the gift.  Upon the death of the annuitant(s), any remaining portion of the gift reverted either to a charity designated by the donor or, if no designation, to TCN.

98.      TCN charitable installment bargain sales ("CIBSs") operated the same as CGA transactions, except that TCN's agreement to make annuity payments was for a

*fixed term* of between 12 and 30 years, rather than over the life of the annuitant.  CIBS gifts became the property of TCN, which had full discretionary authority over investment decisions related to the gift.  Upon the end of the applicable term, any remaining portion of the original gift reverted either to a charity designated by the donor or, if no designation, to TCN.

99.     Since at least 2004 through January 2015, TCN sold 75 Security Products with a total original investment value of approximately $12.9 million, including approximately $8 million in CGAs and $4.9 million in CIBSs.  All of the Security Products were evidenced by written contracts between TCN and the parties establishing the Products.

100.     TCN currently remains obligated to make more than $900,000 in *annual* annuity payments with respect to the Security Products.  These obligations include approximately: $555,000 due annually for outstanding CGAs and $376,000 due annually for outstanding CIBSs.

101.     In almost all cases, TCN did not segregate funds raised through, or received from, the Security Products into separate accounts or subaccounts.  Rather, TCN generally pooled and commingled such funds into its general checking account (the "General Account") before investing the funds or using them for any other purposes.

### TCN's Marketing of the Security Products and Reliance upon Third Parties to Solicit Investors

102.     TCN marketed its Security Products, in part, through two-page brochures that described the respective products.  For each type of Security Product, TCN's brochures represented that the associated payments were "guaranteed."

103.    TCN also marketed its Security Products to prospective investors on its website, which included copies of the brochures as well as webpages dedicated to specific investment products.

104.    For example, a TCN webpage, entitled "Charitable Gift Annuities," stated that gift annuities provide "a guaranteed stream of income," and that TCN "invests [your] contribution, manages it, and pays you fixed payments for life."

105.    Furthermore, on a different webpage entitled "A 10 Minute Course in Charitable Gift Annuities," TCN represented that it invests donor assets "in a diversified portfolio," and more specifically that TCN invests donor funds in the "Gift Annuity Reserve Portfolio," which includes "Stocks; Bonds; Money market instruments; Guaranteed Mortgage Backed Securities; Other types of managed accounts."

106.    As the only officers of TCN, the Browns had ultimate authority over the content of TCN's marketing materials, including the webpages and brochures.

107.    Since at least 2004, TCN primarily relied upon third-party agents called "Philanthropic Development Officers" ("PDOs") to solicit investments in the Security Products.

108.    TCN paid the PDOs commissions of between 6-8% of funds invested in the Security Products without disclosing such payments to investors.  TCN paid these commissions, which approximated a total of $886,000, from the investor funds.

**TCN and the Browns Defrauded the Security Product Investors**

109.    Contrary to the representations contained in marketing materials regarding the Security Products, TCN did not invest assets exchanged for the Security Products in

traditional, diversified investments that were necessary to meet TCN's "guaranteed" payment obligations.  Instead, Kevin Brown, acting on behalf of TCN and with George Brown's knowledge, invested a significant portion of TCN's funds in speculative, concentrated investments in TUG, STC Preferred Stock, Rampart Notes, and at least four other private companies that are now either bankrupt or have gone out of business.

110.    By at least 2008, when some of TCN's speculative investments had already collapsed, TCN was unable to meet its guaranteed annuity obligations with the income stream from its existing investments.  Accordingly, since that time, Kevin Brown operated TCN like a Ponzi scheme – using funds raised from the sale of new Security Products to make the ongoing annuity payments to existing Security Product investors.  Neither TCN nor Kevin Brown ever disclosed this use of funds.

111.    In addition, since at least 2004, Kevin Brown misappropriated funds raised through the Security Products by transferring at least $337,815 from TCN's General Account to BIA.  Furthermore, Kevin Brown and George Brown misappropriated investor funds when they took out undisclosed personal loans from TCN of $250,000 and $110,000, respectively, none of which have been repaid.  The Browns also misappropriated investor funds by authorizing and paying the PDOs the undisclosed commissions of approximately $886,000.

112.    Because of the misuse and misappropriation of investor funds associated with the Security Products, which have been comingled in TCN's General Account, TCN does not currently have enough assets to satisfy its annual annuity payment obligations to Security Product investors.

113.    The misrepresentations and omissions by TCN and the Browns concerning TCN's use of proceeds were material to investors because they believed that their funds would be invested in more traditional, diversified investments that would enable TCN to satisfy its "guaranteed" payment obligations to investors, and not to make Ponzi payments to other investors, to pay commissions to the PDOs, or to misappropriate funds for the benefit BIA or the Browns in their personal capacities.

114.    The misappropriation of investor monies to make Ponzi payments to other investors in the Security Products, to pay commissions to the PDOs, to transfer cash to BIA, and to make personal loans to the Browns was also material.

115.    TCN and the Browns knew or were reckless in not knowing that their misrepresentations and omissions and misappropriation of investor funds described herein were materially false and misleading.

**TCN's Security Products Were Not Registered with the SEC or Exempt from Registration**

116.    The definition of a "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)] includes an " investment contract."

117.    The Security Products offered by TCN are investment contracts, and thus securities under the Securities Act and Exchange Act, because investors made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the efforts of TCN.

118.    From at least 2004 through January 2015, TCN received investments in the Security Products of approximately $12.9 million from more than 70 investors in multiple states.

119.    TCN deposited and pooled investor funds into a single bank account, and the success of those deposits was commonly dependent on TCN's efforts in investing those funds.  Specifically, TCN presented the Security Products as an opportunity for financial gain for investors solely through the efforts of TCN.  In exchange for investor assets, TCN would provide: (1) a Security Product at full value of the exchanged asset; (2) an income stream for the investor and, at the investor's election, an additional individual; and (3) tax benefits.  The investors in the Security Products were not required or expected to do anything besides provide funds in order to receive their annuity payments.

120.    Since at least 2004, TCN did not operate exclusively for a charitable purpose since a significant portion of investor funds from the Security Products inured to the benefit of the PDOs, BIA, and the Browns in their personal capacities.  Nor did the Security Products constitute an insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of an insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any state.

121.    TCN, the Browns, and the PDOs offered and sold securities in the form of the Security Products to investors using the means or instruments of interstate commerce including but not limited to telephones, the Internet, and the mails.

122.    The Security Products were offered and sold to unaccredited and unsophisticated investors in multiple states, and TCN, the Browns, and the PDOs did not have a reasonable basis to believe that all investors were accredited and sophisticated.

123.    TCN, the Browns, and the PDOs did not provide current or prospective investors with an audited balance sheet or any other financial disclosures.

124.    TCN did not have a pre-existing substantive relationship with each investor, and, therefore, engaged in a general solicitation.

125.    TCN's Security Product offerings have never been registered with the SEC or any state securities authority.

**D.    Kevin Brown and STC Collected Transaction-Based Fees from Certain Investments While Acting as Unregistered Brokers**

**Kevin Brown Received Transaction-Based Fees from STC Client Investments in Certain Mutual Funds and ETF Portfolios**

126.    Since at least 2008 through 2014, STC offered clients the opportunity to purchase certain mutual funds (the "Funds") and model ETF portfolios (the "ETF Portfolios") on its trust platform.  Both the Funds and ETF portfolios are "securities" as defined by the Securities Act and Exchange Act.

127.    For purchases of either the Funds or the ETF Portfolios, STC charged certain asset-based fees based upon the value of the securities purchased, and then shared part of its fee with referring Independent Consultants as sales-based commissions for their efforts in soliciting the client investments.

128.    Between approximately 2008 and 2014, STC received approximately $1 million in fees from its clients' investments in the Funds.  From those fees, Kevin Brown

paid himself transaction-based fees of approximately $60,000 as the referring

Independent Consultant for actively soliciting and advising investors to purchase the

Funds.

129.    Similarly, between 2009 and 2014, STC received approximately $231,000

in fees from its clients' investments in the ETF Portfolios.  From those fees, Kevin

Brown paid himself transaction-based fees of approximately $7,000, again as the

referring Independent Consultant for actively soliciting and advising investors to

purchase the Portfolios.

130.    During the period for which he paid himself the transaction-based fees

alleged in paragraphs 128 and 129, above, Kevin Brown: (a) was engaged in the business

of effecting transactions in securities for the account of others; and (b) was not associated

with a broker or dealer registered with the Commission.

**STC Received Transaction-Based Fees from Investments in Certain
Promissory Notes**

131.    Starting in approximately 2013, an entity known by the Browns began

issuing its own promissory notes (the "Promissory Notes").  The Promissory Notes issued

by the entity ("Entity") are "securities" as defined by the Securities Act and Exchange

Act.

132.    Beginning in August 2013, one of STC's Independent Consultants

solicited at least seven investors in the Promissory Notes, and received certain

transaction-based fees on those sales from the Entity.  Of those transaction-based fees,

the Independent Consultant shared with STC a total of approximately $176,000 due, in

part, because STC actively effected the transactions by agreeing to custody the Promissory Notes on its trust platform.

133.    During the period for which STC received its portion of the transaction-based fees alleged in paragraph 132, above, STC: (a) was engaged in the business of effecting transactions in securities for the account of others; and (b) was not registered as a broker or dealer with the Commission nor was it associated with a broker or dealer registered with the Commission.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Securities Act Sections 17(a)(1), (2), and (3)
### [15 U.S.C. § 77q(a)]
### (All Defendants)

134.    Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

135.    Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, in violation of Section 17(a)(1) of the Securities Act.

136.    Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by

omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act.

137.    Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities, in violation of Section 17(a)(3) of the Securities Act.

138.    By reason of the foregoing, Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Sections 17(a)(1), (2) and (3) of the Securities Act  [15 U.S.C. §§ 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Fraud in the Purchase or Sale of Securities**
**Violations of Exchange Act Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(All Defendants)**

139.    Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

140.    Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown, directly or indirectly, with scienter, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

141.     By reason of the foregoing, Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Prohibited Transactions by Investment Advisers
### Violations of Advisers Act Sections 206(1) and (2)
### [15 U.S.C. § 80b-6]
### (Defendants RCM, BIA, Kevin Brown, and George Brown)

142.     Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

143.     Based on the conduct as alleged above concerning the Rampart Note offering, Defendants RCM and BIA were both acting as "investment advisers" as defined by Section 202(a)(11) of the Advisers Act.  Similarly, through their ownership and control of RCM and BIA, Defendants Kevin Brown and George Brown were also acting as "investment advisers."

144.     Defendants RCM, BIA, Kevin Brown, and George Brown, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce: (a) with scienter, employed devices, schemes or artifices to defraud any client or prospective client; and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

145.     By reason of the foregoing, Defendants RCM, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6].

**FOURTH CLAIM FOR RELIEF**
**Prohibited Transactions by Investment Advisers**
**Violations of Advisers Act Section 206(3)**
**[15 U.S.C. § 80b-6]**
**(Defendants RCM, BIA, Kevin Brown, and George Brown)**

146.     Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

147.     Defendants RCM, BIA, Kevin Brown, and George Brown, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as principals for their own account, knowingly sold securities or purchased securities from a client without disclosing to such client in writing before the completion of such transaction the capacity in which they acted and obtaining the consent of the client to such transaction.

148.     By reason of the foregoing, Defendants RCM, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6].

**FIFTH CLAIM FOR RELIEF**
**Prohibited Transactions by Investment Advisers**
**Violations of Advisers Act Section 206(4) and Rule 206(4)-8 thereunder**
**[15 U.S.C. § 80b-6 and 17 C.F.R. § 275.206(4)-8]**
**(Defendants RCM, BIA, Kevin Brown, and George Brown)**

149.     Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

150.     Defendants RCM, BIA, Kevin Brown, and George Brown, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative to a pooled investment vehicle.

151.     By reason of the foregoing, Defendants RCM, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## SIXTH CLAIM FOR RELIEF
### Sale of Unregistered Securities
### Violations of Securities Act Sections 5(a) and (c)
### [15 U.S.C. §§ 77e(a), 77e(c)]
### (All Defendants)

152.     Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

153.     Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown, directly or indirectly, by use of the means or instrumentalities of interstate commerce or by use of the mails, offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities.

154.     By reason of the foregoing, Defendants STC, RCM, TCN, BIA, Kevin Brown, and George Brown violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### SEVENTH CLAIM FOR RELIEF
**Offers and Sales of Securities by Unregistered Brokers or Dealers**
**Violations of Exchange Act Section 15(a)**
**[15 U.S.C. § 78o(a)]**
**(Defendants STC and Kevin Brown)**

155.    Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

156.    Defendants STC and Kevin Brown, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act.

157.    By reason of the foregoing, Defendants STC and Kevin Brown violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting the Rampart Fund's Violations of**
**Section 7(a) of the Investment Company Act**
**[15 U.S.C. § 80a-7(a)]**
**(Defendants RCM, BIA, STC, Kevin Brown, and George Brown)**

158.    Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

159.    Based on the conduct as alleged above, the Rampart Fund violated Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)] by engaging in prohibited transactions by an unregistered investment company.

160.     Defendants RCM, BIA, STC, Kevin Brown, and George Brown knew, or were severely reckless in not knowing, of the Rampart Fund's violations as alleged above, and they substantially assisted the Rampart Fund in committing these violations.

161.     By reason of the foregoing, Defendants RCM, BIA, STC, Kevin Brown, and George Brown aided and abetted the Rampart Fund's violations of Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)], and unless restrained and enjoined will continue to aid and abet violations of those provisions.

**NINTH CLAIM FOR RELIEF**
**Equitable Disgorgement**
**(All Relief Defendants)**

162.     Paragraphs 1 through 133 are re-alleged and incorporated herein by reference.

163.     Relief Defendants Rampart Fund, WMO, and Hoddinott obtained money, property, and assets which were derived from the violations of the securities laws by the Defendants as alleged herein.

164.     Relief Defendants Rampart Fund, WMO, and Hoddinott should be required to disgorge all ill-gotten gains, which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment, and constructive trust.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that the Court:

### I.

Find that each of the Defendants committed the violations alleged in this Complaint and unless restrained will continue to do so;

### II.

Enter injunctions, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants and their officers, agents, servants, employees, attorneys, fictitious trade name entities, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating the laws and rules alleged against them in this Complaint;

### III.

Order that each of the Defendants and Relief Defendants disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the activities set forth in this Complaint;

### IV.

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9], and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)];

## V.

Enter an order appointing a receiver over the assets of Defendants STC and TCN and Relief Defendant Rampart Fund; and

## VI.

Grant such other relief as this Court may deem just or appropriate.

### JURY DEMAND

The Commission demands a jury trial in this matter.

DATED: October 27, 2015

_____
Stephen C. McKenna
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
Denver Regional Office
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, CO  80294-1961
(303) 844-1000
mckennas@sec.gov

Of Counsel:
Noel M. Franklin